UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT OSTERHAGE

        Plaintiff,

v.

FIRST INDUSTRIAL REALTY TRUST, ET AL.,

        Defendants.
_____/

Case No.  10-14718

SENIOR UNITED STATES DISTRICT JUDGE
ARTHUR J. TARNOW

MAGISTRATE JUDGE MARK A. RANDON

**ORDER GRANTING DEFENDANT BOSCH REXROTH CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON CROSS-CLAIM [23] AND DENYING DEFENDANT FIRST INSTUSTRIAL REALTY TRUST'S MOTION FOR SUMMARY JUDGMENT ON CROSS-CLAIM [32]**

        Defendants Bosch Rexroth Corporation ("Rexroth") and First Industrial Realty Trust's ("First Industrial") bring Motions for Summary Judgment ([23] and [32], respectively) on First Industrial's Cross-Claim for Indemnification. The Court heard oral argument on these motions on February 14, 2012. For the reasons stated below, Rexroth's Motion [23] is GRANTED. First Industrial's Motion [32] is DENIED.

### I. Procedural History

        Osterhage originally filed this action in Oakland County Circuit Court on October 20, 2010, and served the Complaint on Defendants on or about November 1, 2010. On November 29, 2010 Defendants jointly removed this action to this court. First Industrial filed its Cross-Claim [16] on April 28, 2011. Rexroth filed its Motion for Summary Judgment [23] on June 30, 2011. First Industrial filed its Motion for Summary Judgment [32] on August 4, 2011.

### II. Background

        Plaintiff Robert Osterhage originally filed this action on November 29, 2010. Osterhage alleged that he was harmed by exposure to toxic mold at his place of employment with Rexroth. The facility at which Osterhage worked was rented by Rexroth from its owner, First Industrial. After filing this action, Osterhage and Rexroth agreed that Osterhage's remedy against Rexroth was limited to recovery of worker's compensation benefits under Mich. Comp. L. § 418.131; Osterhage's

claims against Rexroth were therefore dismissed with prejudice according to a stipulated order [21]. However, Osterhage's claims against First Industrial remain. First Industrial brought a cross-claim against Rexroth, arguing that Rexroth was required to indemnify First Industrial according to the terms of the contract between the two. The instant cross-motions for summary judgment concern this cross-claim for indemnification. There are two general issues that the parties dispute: First, whether the contract permits indemnification and, if it does, which party bears the responsibility for the growth of the mold.

The lease between Rexroth and First Industrial was executed on or about April 26-27, 2007, with the lease commencing on May 1, 2007. Prior to the commencement of the lease, the building in question ("the Facility") had been vacant for between eighteen months and two years. The lease contains a warranty that the Facility's heating, ventilation, and air conditioning system ("HVAC") were "In good working order and condition (as reasonably determined by [First Industrial] . . .). The lease also required First Industrial to make repairs to the facility on notice from Rexroth if damage is caused by "fire or other casualty . . . ."

The lease also contains an indemnification section under which Rexroth and First Industrial are each required to indemnify the other for certain "Losses" under specific circumstances. First Industrial must indemnify Rexroth for any "Losses" that "arise from or in connection with" "any negligent, willful, or intentional acts or omissions of [First Industrial] . . . and . . . any breach by [First Industrial] of any or all of its warranties, representations, [and] covenants under this Lease." In turn, Rexroth must indemnify First Industrial if it engages in acts, omissions or negligence during its rental of the Facility that result in "losses."

Sometime after the commencement of the lease on May 1, 2007, Rexroth became aware of the mold problem because of the complaints of employees. An inspection on June 4, 2007, found that all twenty roof-top units ("RTUs") of the HVAC system were in "poor" or "very poor" shape. Rexroth's M. Summ. Judg. ("Rexroth's M."), Ex. E. Rexroth alleges that the problems with the HVAC units resulted in "water leakage through the RTUs themselves, high indoor heat and humidity, and foul smells." Humidistats in the building found that the average humidity was roughly 70%. Humidity over approximately 55% is conducive to the growth of mold. Rexroth's M., Ex. F at 7. Osterhage, in a deposition, testified that he and others began complaining to Rexroth about the condition of the building at the end of July and beginning of August. Osterhage and other

employees found significant amounts of mold behind the wallpaper of certain areas of the Facility. Rexroth's M., Ex. G at 58, 61.

First Industrial, through the deposition testimony of two employees, Michael Stadler, a facilities manager, and Niraj Sarda, a property asset manager, argues that regular inspections of the Facility took place prior to Rexroth's possession of the facility and that the inspections demonstrate that the Facility was in good condition prior to Rexroth's lease. These inspections have not been entered as evidence. On August 10, 2007, a representative of Rexroth met with First Industrial's employee Sarda to discuss the status of the RTUs and request that First Industrial pay for repairs. On August 24, 2007, Sarda stated that First Industrial would spend $40,000 to replace a number of the worst RTUs. The rest of the RTUs were to be replaced on a phased schedule over several years; the replacement costs of these additional RTUs was to be added to Rexroth's monthly rent.

On August 30, 2007, Rexroth hired "Sanit-Air," an environmental consultant, to evaluate the air quality in the Facility. Sometime in September, an assessment was performed by consultants hired by First Industrial which apparently did not find harmful conditions in the building. Rexroth's M., Ex. at 65-66. On October 16, 2007, consultants hired by Rexroth to assess the Facility's mold levels found elevated concentrations of mold spores in some areas of the Facility. *Id.* Employees were moved into a small part of the facility for roughly thirty days, and were then fully evacuated from the Facility after more testing. *Id.* at 66-67. A containment unit was set up in the building to clean off computers and other equipment, but a large amount of papers could not be removed from the building. Safe areas in the building were still usable, but much of the building was cordoned off. *Id.* at 67-68. On October 29, 2007, Rexroth informed Sarda that nine of the twenty RTUs at the facility had failed. Rexroth's M., Ex. F at 13. Five of the RTUs were replaced on November 8, 2007. The remaining RTUs were replaced in January, 2008. Mold remediation was completed in the spring of 2008. Rexroth's M., Ex. G at 70. On December 12, 2008, Rexroth and First Industrial executed an amendment to the lease which states in pertinent part that Rexroth "agrees to release and hold [First Industrial] harmless for any Losses (as that term is defined n Sections 17.2 and 17.3 of the Lease, respectively) related to claims made by or through [Rexroth], and its respective agents, officers and employees, as to the [mold issues]." First Industrial also agreed to release Rexroth in the same manner.

### III. Analysis

The questions before the Court are thus the following:

(1)    Is Osterhage an "employee" under the terms of the December amendment to the lease?

(2)    Did indemnifiable losses occur on the part of either Rexroth or First Industrial? As a part of this question, it is necessary to determine whether the mold growth that may have harmed Osterhage was due to either party's negligence.

**Osterhage's Status As an Employee**

One of Rexroth's primary arguments in its motion for summary judgment on First Industrial's cross-claim is that the December amendment to the lease agreement between Rexroth and First Industrial, which releases First Industrial from liability from claims by Rexroth "employees," does not apply to Osterhage. Rexroth argues that, at the time Osterhage began the instant lawsuit against Rexroth and First Industrial, he had quit his job at Rexroth and was therefore not an "employee" within the meaning of the lease amendment. In support of this argument, Rexroth cites a number of cases supporting the general proposition that "the trial court must give the language in the contract its ordinary and plain meaning." *Mich. Bell Telephone Co. v. MCI Metro Access Transmission Servs., Inc.*, 323 F.3d 348, 357 (6th Cir. 2003). Rexroth argues that because the lease amendment releases First Industrial only from claims by "employees" and not "former employees," Osterhage's suit is not covered by the amendment.

Rexroth's argument is not supported by any case law. It is undisputed that when a plaintiff brings a claim against a former employer, courts look to a person's status as an employee at the time of injury. *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (referring to plaintiff who was arguing that they had been constructively discharged as an "employee" within the meaning of Title VII despite the fact that he was no longer employed at time of lawsuit); *Mahdesian v. Joseph T. Ryerson & Son, Inc.*, 986 F.2d 1421 at *1 (6th Cir. 1993) (unpublished) (noting plaintiff had to demonstrate he was an employee at the time of his injury to recover under Michigan's no-fault law). The Court declines to adopt Rexroth's argument that the term "employees" should be read as only meaning "persons employed at the time they bring the lawsuit." Nor is there any evidence in the record that the parties intended the term "employees to have this meaning."

**First Industrial's Motion for Summary Judgment**

First Industrial must indemnify Rexroth for any "Losses" that "arise from or in connection with" "any negligent, willful, or intentional acts or omissions of [First Industrial] . . . and . . . any breach by [First Industrial] of any or all of its warranties, representations, [and] covenants under this Lease." In turn, Rexroth must indemnify First Industrial if it engages in acts, omissions or negligence during its rental of the Facility that result in "Losses." The only dispute regarding whether Osterhage's alleged injuries are a "loss" stems from whether they are the negligent, willful, or intentional acts of one of the parties. If Osterhage's injuries were caused by the negligence of either party, they are a "Loss." Rexroth and First Industrial present arguments regarding why the other party is responsible for the loss and should therefore not be indemnified.

First Industrial's argument is much the weaker of the two. First, through the deposition testimony of two employees, Michael Stadler, a facilities manager, and Niraj Sarda, a property asset manager, First Industrial argues that regular inspections of the Facility took place prior to Rexroth's possession of the facility. These inspections have not been provided as evidence. Both employees claim that said inspections demonstrate that the Facility was in good condition prior to Rexroth's lease and that any health issues and mold must have developed sometime after May 1, 2007. First Industrial thus places the blame for the development of the mold on unspecified actions on the part of Rexroth. Second, First Industrial relies on the allegations made by Osterhage in his complaint and in certain deposition statements that Rexroth was responsible for his injuries. For instance, First Industrial cites a section of the complaint wherein Osterhage alleges he was forced to work within the Facility for months after Rexroth knew it was infected with toxic mold.

In response, Rexroth notes that it paid for multiple independent inspections of the Facility after being notified about the mold problem in late July/early August and immediately took steps to remove its employees from harm and contain the toxic area. Rexroth also cites testimony from Osterhage in which Osterhage stated that First Industrial was aware of water leaking into the building prior to the commencement of the lease. Rexroth's M., Ex. G at 62-63.

Summary judgment is appropriate under Fed. R. Civ. P. 56(c)(2) where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law." The facts and all inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party.

*Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once a moving party produces evidence establishing lack of a genuine issue of material fact, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Id*. The mere existence of "a scintilla of evidence" in support of a plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252.

To succeed on a Motion for Summary Judgment such a motion, First Industrial must establish that there is no material fact in dispute that Rexroth was negligent or willful in causing the "Loss" of Osterhage's alleged injuries. The testimony of two employees of First Industrial that, in essence, "there is nothing to see here" fails to create a genuine dispute over a material fact. The reports cited by the employees have not been submitted into evidence; it is thus impossible to verify their accuracy. Osterhage's allegations against Rexroth, which are conclusory in nature, also do not provide any evidence of negligence on the part of Rexroth.

At the very minimum, First Industrial has not established a right to summary judgment on the question of Rexroth's negligence. Therefore, First Industrial's Motion for Summary Judgment [32] is DENIED.

**Rexroth's Motion for Summary Judgment**

Drawing on the evidence presented by Rexroth, from Osterhage's deposition, and made before the court at the hearing on February 14, 2012, Rexroth acted quickly to remove its employees from harm's way once it determined that their working environment was unsafe. Osterhage testified that his initial complaints occurred at the end of July or beginning of August 2007. The first inspection paid for by Rexroth occurred on August 30, 2007. An inspection paid for by First Industrial occurred in September. Rexroth then paid for another inspection on October 16, 2007, at which point unsafe conditions were determined to exist. Employees were then moved to a "safe" area that was sealed off from the contaminated sections of the building, were provided with hazmat suits, and eventually moved out of the building entirely.

The Court finds that no evidence has been presented or is evidence in the record that puts into dispute the factual question of whether Rexroth was negligent[1] in their reaction to Osterhage's complaints. From the undisputed evidence available to the Court, Rexroth acted responsibly to determine whether the Facility was, in fact, contaminated and when they did find contamination, Rexroth reacted appropriately.

According, Rexroth's Motion for Summary Judgment [23] on First Industrial's Cross-Claim for Indemnification is GRANTED.

### III. Conclusion

For the reasons stated above,

**IT IS ORDERED THAT** Defendant Rexroth's Motion for Summary Judgment [23] on First Industrial's Cross-Claim for Indemnification is **GRANTED**. Defendant First Industrial's Motion for Summary Judgment [32] on its Cross-Claim for Indemnification is **DENIED**.

As this order resolves the cross-claim, the only remaining issue in this case involves Plaintiff's claims against First Industrial. A final pre-trial conference will be held on May 7, 2012 at 3:00 p.m.

**SO ORDERED.**

              s/Arthur J. Tarnow
              ARTHUR J. TARNOW
              SENIOR UNITED STATES DISTRICT JUDGE

Dated: March 29, 2012

---

[1] The elements of a negligence claim in Michigan are that a party owed another a duty, that the standard of care of the party fellow the level required by that duty (a breach of the duty), and that the breach caused a specific injury. *See, e.g. Case v. Consumers Power Co.*, 463 Mich. 1, 6 (2000) (setting out elements of negligence claims in Michigan).